**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**ROCK HILL DIVISION**

| | |
|---|---|
| JENNY R. CUNNINGHAM, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 0:09-2984-MJP -JRM |
| ) | |
| v. ) | |
| ) | |
| LANCASTER HOSPITAL ) | **REPORT AND RECOMMENDATION** |
| CORPORATION, a subsidiary ) | |
| of Community Health Systems Inc., ) | |
| also known as Springs Memorial ) | |
| Hospital, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

Plaintiff, Jenny R. Cunningham ("Cunningham"), brings this action against her former employer, Springs Memorial Hospital ("SMH").[1] She allege that she was terminated because of her race, and that she suffered retaliation for engaging in statutorily protected activity in violation of Title VII. SMH filed a motion for summary judgment on January 9, 2011. Cunningham filed a response on February 7, 2011. SMH filed a reply on February 25, 2011. Pretrial matters in this case were automatically referred to the undersigned pursuant to 28 U.S.C. § 636 and Local Civil Rule 73.02(B)(2)(g) DSC. This Report and Recommendation is entered for the Court's consideration.

**Standard for Summary Judgement**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] Apparently in the early 1990s, SMH was purchased by Community Health Systems, Inc., but still operates as SMH.

56(a). *See also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). A fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. Anderson, 477 U.S. 242 at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

The defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718-19 (citing Anderson, 477 U.S. at 247-48).

"[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c) (1)(A-B).

Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e)(1-4).

**Facts**

The facts, either undisputed, or according to the Plaintiff as the non-moving party, with all reasonable inferences therefrom, to the extent supported by the record, are as follows:

1.  Cunningham is African-American.

2.  Cunningham began working as an LPN at SMH in 1976.  She became an RN shortly thereafter, and worked in that capacity until her termination in 2009.

3.  The record contains evidence of concerns about Cunningham's performance throughout her tenure, but the relevant period begins in 2006 when Amy Shehane ("Shehane") became SMH's Director of Nursing. (Pl.Mem., p. 2).[2]

4.  On July 13, 2006, Shehane gave Cunningham a verbal warning for substandard work relating to "hanging" of an incorrect IV medication for a patient. (Pl.Dep., Ex. 4).

---

[2]According to Cunningham, "(b)eginning in 2006, Defendant began a campaign of racially discriminatory attacks on Plaintiff that culminated in her termination in 2009." (Pl.Mem., p. 2).

|   |   |
|---|---|
|   | Cunningham testified at her deposition that another nurse hung the IV but she documented it. (Pl.Dep., pp. 74-76). |
| 5. | On August 10, 2006, Shehane suspended Cunningham for three days with pay for a poor attitude and arguing with her concerning "additional responsibilities." Cunningham responded that she was "kind to everyone" and assisted others on the unit. (Pl.Dep., Ex. 5). |
| 6. | On February 13, 2008, Shehane gave Cunningham a verbal warning for a bad attitude ("complaints received from staff about unfair assignments, unwilling to work as a team, making others feel incompetent, disrespect..."). Cunningham disagreed with the warning. (Pl.Dep., Ex. 6). |
| 7. | On February 20, 2008, Shehane issued Cunningham a verbal warning for a "clock-out" violation.[3] Shehane stated: |

> This has been discussed in staff meetings and individually re: clocking out timely at end of shift, over last 3 pay periods this has been a continuous problem (1) PPE 2/16 - 6 hrs were accrued due to late clock out (2) PPE 2/2 4 accrued (3) PPE 1/19 8 accrued.
>
> Corrective Action Recommended: Clock out time should be no more than 6 minutes past end of shift.

Cunningham responded:

Supervisor notified most time when late getting off. Sometimes admission are late and has to finish.

(Pl.Dep., Ex. 9).

---

[3]Clock-out violations appear to stem from a practice of staying after the end of a shift to complete paperwork instead of keeping up with the paperwork during the shift.

8.  On February 21, 2008, Cunningham wrote Kevin Driver ("Driver"), SMH's Human Resources Director, because Shehane had criticized her the day before for being unorganized, staying too late (i.e., not clocking out on time), making unfair assignments, and being rude to co-workers. Cunningham described the allegations as "all lies and a form of harassment" which she attributed to her having previously contacted Driver concerning a "mandatory overtime" issue. She noted that "(w)hen I think I am going to be late getting off, I notify the supervisors." (Pl.Dep., Ex. 7).

9.  On April 23, 2008, Shehane issued Cunningham a written warning for clock-out violations. Cunningham again disagreed. (Pl.Dep., Ex. 10).

10. On May 21, 2008, Shehane issued Cunningham a "final written warning" for a clock-out violation. (Pl.Dep. Ex. 11).

11. On July 1, 2008, Shehane suspended Cunningham for 3 days without pay for a clock-out violation. Shehane initially marked the "termination" box on the form, but changed it to a 3 day suspension. Shehane indicated "next late clock violation to result in termination if unexcused." (Pl.Dep., Ex. 12).

12. Cunningham filed a grievance dated July 19, 2008 pursuant to SMH procedure to challenge the 3 day suspension. (Pl.Dep., Ex. 13).

13. A meeting was held on July 23, 2008 in connection with the third step of the grievance process before Tom McDougal, CEO. Cunningham and Trent Elmore of Human Resources were present. A number of issues were addressed, but the suspension was upheld based on statistics that showed from January 1, 2008 to June 30, 2008, Cunningham had clocked out late 27 times in 53 shifts (51%) assigned to

her. The statistics showed that other nurses had also clocked out late, but Cunningham was by far the most frequent offender. Further, it was also shown that the late clock-out issue was discussed in staff meetings throughout the period. (Pl.Dep., Exs. 14 and 15).

14. On July 26, 2008, Cunningham moved her grievance to the fourth and final step before David Miller ("Miller"), President of Community Health Systems, Inc. (Pl.Dep., Ex. 16).

15. On August 20, 2008, Miller resolved the grievance by writing Cunningham stating:

    1. You will receive pay for the three day suspension incurred regarding this matter;

    2. You will obtain "pre-approval" from in-house management prior to working beyond your shift; and

    3. Nursing management will continue to treat all employees in the same manner regarding "time worked passed the normal scheduled shift." This will include the same notice requirements and the same disciplinary actions for violations of this policy for any employee.

    (Pl.Dep., Ex. 17).

16. An incident occurred on January 26, 2009 between Cunningham and another nurse, Brenda Hyatt ("Hyatt"), over the assignment of incoming patients. (Pl.Dep., Ex. 19).

17. On February 11, 2009, another incident occurred which ultimately led to Cunningham's termination. Cunningham was assigned to administer by IV total parenteral nutrition ("TPN") to a patient. An issue arose between Cunningham, Shehane, and an LPN, Teresa Smith ("Smith") when the administration of TPN was delayed. The incident, discussed more fully below, led to Shehane recommending

   Cunningham's termination for insubordination, failure to comply with hospital policy, and attitude. (Pl.Dep., Ex. 19).

18. Cunningham was terminated on or about February 18, 2009. She filed a "Charge of Discrimination" with the South Carolina Human Affairs Commission ("SCHAC") dated March 28, 2009. Cunningham marked the boxes for race discrimination and retaliation. In the "Particulars" portion of the charge, Cunningham stated:

> The reason given by the Respondent was a pretext .I contend that I did not refuse to hang TPN for a patient. I told the LPN to get everything together and I would show her how to hang the TPN because I was in the process of admitting and medicating a patient. I am aware of white employees who were treated better than I was for far more serious charges and were only suspended from their positions and were not fired. Additionally, I filed an internal grievance in August 2008 and I won the case. I therefore believe I was discharged because I am Black and in retaliation because of the grievance that I filed.

(Pl.Dep., Ex. 21).

19. SCHAC issued a "no cause" letter and advised Cunningham of her right to sue. (Pl.Dep., Ex. 22).

## Discussion

Cunningham alleges that she was terminated because of her race and in retaliation for filing a grievance with respect to her 3 days suspension. SMH argues that Cunningham has no direct evidence and that she cannot establish a prima facie case on either of her claims. Further, SMH argues that even if Cunningham could establish a prima facie case, it has a legitimate, non-discrimination reason for her termination.

1. Race Discrimination

Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may proceed under ordinary principles of proof using direct or indirect evidence, or, in the absence of direct proof of a defendant's intent to discriminate, a plaintiff can employ the scheme outlined in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to establish a prima facie case of discrimination. *See* Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1286 (4th Cir.1985); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir.), *cert. denied*, 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995); McDonnell Douglas, 411 U.S. at 802. McDonnell Douglas provides that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas, 411 U.S. at 802. If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. *Id.* at 804; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Cunningham does not assert that she has produced direct evidence of discrimination. Instead she relies on the McDonnell Douglas burden shifting analysis. The parties appear to agree that the present case involves an allegation of disparate discipline based on race (*see* Def.Mem., p. 15 and Pl.Mem., p. 3), and that the following framework applies for Plaintiff to establish a prima facie case:

1. Membership in a protected class;

2. Satisfactory job performance;

3. An adverse employment action; and

4. Different treatment of similarly situated employees outside the protected class.

(Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), (citing White v. BFI Waste Serv., LLC, 375 F.3d 288, 295 (4th Cir. 2004)).

The parties also agree that Cunningham has established the first three prongs of the prima facie case. SMH concedes Cunningham's job performance was satisfactory "at least to the extent that she was not about to be terminated." (Def.Mem., p. 14). In making this concession, SMH recognizes that the series of "clock-out" violations, which appear to have concluded with the resolution of Cunningham's grievance six months earlier, did not amount to unsatisfactory job performance at the time of termination.

SMH argues that Cunningham cannot establish her prima facie case because she has not shown that similarly situated employees outside the protected group received less severe discipline for like conduct. In her SCHAC charge, quoted above, Cunningham states: "I am aware of white employees who were treated better than I was for far more serious charges and were only suspended from their positions and were not fired." The only evidence of Cunningham's comparators in the record is her deposition testimony. Cunningham testified that two white females were caught at different times engaging in sex while on the job. However, Cunningham conceded that she had no personal knowledge of the events or discipline, and that her testimony was based on rumor. (Pl.Dep., pp. 86-89). Cunningham also testified that another RN violated HIPAA regulations by telling her sister that a baby at SMH was available for adoption. Cunningham believes this nurse was

suspended. (Pl.Dep., pp. 89-90). However, the only evidence in the record is Cunningham's inadmissible hearsay testimony.

The only other comparator mentioned by Cunningham is Hyatt, an RN with whom she worked. Cunningham testified that on an unspecified date, Hyatt administered the wrong medication to a patient. SMH has produced evidence that on October 14, 2008, Shehane gave Hyatt a written warning for failure to comply with hospital policy for administering a medication to the wrong patient. (Def.Mem., Ex. B). This discipline is roughly equivalent to the verbal warning Cunningham received on July 13, 2006, when Cunningham allowed another nurse to administer a medication for her incorrectly, and then failed to check to see if it was correct before charting that it was. (Pl.Dep., pp. 74-77 and Ex. 4).

Plaintiffs are required to show that they are similar in all relevant respects to their comparator. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992); Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir.1994) (citing The Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir.1989)). Such a showing would include evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell, 964 F.2d at 583. Haywood v. Locke, 387 Fed.Appx. 355, 359 (4th Cir. 2010).

Cunningham has offered no evidence as to her comparators and makes no real argument to contradict the arguments of SMH. (Pl.Mem., pp. 3-4). Instead, Cunningham lapses into analytical irrelevancies arguing that she was the only black nurse on her shift, she was given a disproportionate share of work, a co-worker made a remark that she thought showed racial prejudice (referring to

indigents as "those people"), and that criticisms of her attitude were code words for race discrimination.

The undersigned concludes that Cunningham has failed to present sufficient proof to establish the fourth prong of her prima facie case.

SMH argues in the alternative that if Cunningham has established a prima facie case, it has a legitimate, non-discriminatory reason for her termination. As noted above, termination was based on insubordination, attitude, and failure to comply with hospital policy in connection with the failure to begin the TPN treatment on time on February 11, 2009.

Pursuant to SMH policy "(a)ll [TPN] bags will be hung at 1700 (5 p.m.) each day." (Pl.Dep., Ex. 19). Cunningham verified the policy during her deposition. (Pl.Dep., p. 127). While the events of February 11, 2009 are not entirely clear, it is undisputed that the hanging of the TPN bag was assigned to Cunningham and that it was eventually hung at 1940 (7:40 p.m.).

Teresa Smith, an LPN, gave the following account:

> On 2/11/09 approx. 1730 I asked Jenny Cunningham if she would start TPN on pt in rm. 206. She told me she would show me how and said we needed a filter set. Talked with Amy Shehane RN it was told I could not start it 1500. I asked Jenny Cunningham again, telling what Amy had said. Jenny said, I could start it under the direct supervision of an RN. and that she would show me how 1830. Talked with Amy again and she told Jenny that I could not start it and she preceded(sic) to argue with Amy that I could.

(Def.Mem., Ex. 19).

Shehane also gave a statement:

> At approximately 1800 Teresa Smith LPN informed me that TPN needed to be started on one of her patients, and that she has asked Jenny to do it, per Teresa, Jenny told her that she could hang it. Teresa informed her that I said per policy she could not hang it. Jenny told her again, yes you can, under the supervision of an RN, Teresa told her that she had never hung it before and she would ask me, but I was in a procedure with a physician. At 1830, Teresa informs me that the TPN still had not

> been started; Jenny said we needed a filter adapter. Warehouse was called per Phyllis Bell RN. The filter was brought to the floor around 1900. I told Jenny the filter was here and the TPN needed to be started. Jenny stated that the next shift would just have to do it because she was behind and did not have time to do it, and that Teresa (LPN) could do it. I informed her that LPNs could not initiate TPN, and that she needed to do ASAP, that everyone was behind, the TPN was already 2 hrs late getting started, and it needed to be done before she left. Jenny argued with me at the desk that she knew LPNs could hang TPN, and she didn't have time anyway. I told her she could review the policy, but right now she needed to start it. She proceeded in the med room, and later did start the TPN at 1940. It is against hospital policy and South Carolina State Board of Nursing for LPNs to initiate and maintain TPN.

(*Id.*)

A statement of Paula Dixon is also of record:

> On Wednesday 2/11/09, I was at the desk with Jenny and Teresa, when Teresa asked Jenny to hang some TPN. Jenny said she would show her how, Teresa said she didn't know how and that she thought a LPN could not hang it anyway. At this point second shift was coming on, Jenny, Teresa, myself and second shift was at the desk. Teresa told Jenny again, and Jenny said a LPN can hang it and Amy Shehane said no, look at the policy, she was arguing with Amy at the desk, she said she was busy, night shift could hang and Amy said no its already 2 hrs late, so then she said to Teresa, she needed a filter, when the filter came, she ended up going and hanging it.

(*Id.*)

Although Cunningham testified during her deposition that she was not "argumentative," it is clear that she was insistent with Shehane that an LPN, Smith, could hang the TPN bag. Cunningham continued this insistence during the first part of her deposition. (Pl.Dep., pp. 119-127). However, later in the deposition, when she was shown the specific SMH policy dealing with TPN, she conceded that pursuant to that policy, an LPN could not administer TPN. (Pl.Dep., p. 132). The SMH specifically states that "Licensed Practical Nurses (LPN II) may not...administer TPN via central line." (Def.Mem., Ex. 19).

Cunningham has attached an advisory opinion from the South Carolina Board of Nursing to her memorandum which states that "it is within the extended role practice of selected LPN to perform

procedures and to administer ordered treatments via peripheral and central venous access devices and lines according to the following stipulations..." (Pl.Mem., Ex. A). The stipulations provide in part that the "agency" employing the LPN must establish certain policies and procedures to "qualify the LPN to perform the procedures and that the LPN must complete "special education and training" in the procedures. (Pl.Mem., Ex. A). As noted above, SMH policy specifically stated that an LPN could not hang TPN bags and Smith's statement, quoted above, indicates that she did not know how to start the TPN treatment.

Cunningham now appears to argue that she had a good faith belief that an LPN could administer TPN "at the time she gave the instruction to do so" (Pl.Mem., p. 6), quoting another portion of the Board of Nursing's advisory opinion. However, Cunningham ignores the stipulations at the beginning of the advisory opinion discussed above. Even if Cunningham had a good faith belief that she was right, the record before the Court ultimately shows that she was wrong. Cunningham's insistence of her mistaken position to Shehane was construed as displaying a poor attitude and insubordination.

Cunningham makes one other argument with respect to the administration of TPN. She argues that the two hour and forty minute delay was due to the fact that a filter had to be ordered from the warehouse. However, it is clear that it was Cunningham's responsibility to administer the TPN, and if she had acted in a timely manner (i.e., attempting to administer the TPN by 1700 in accordance with SMH policy), the delay could have been avoided or greatly reduced.

Cunningham has not established a prima facie case of discrimination, nor has she shown that SMH's reasons for terminating her were pretextual.

2. <u>Retaliation</u>

To establish a prima facie case of retaliation pursuant to Title VII (42 U.S.C. § 2000e-3(a)), it must be demonstrated that:

(1) the employee engaged in protected activity;

(2) the employer took some adverse employment action against the employee; and

(3) a causal connection existed between the protected activity and the adverse action.

*See* <u>Anderson v. G.D.C., Inc.</u>, 281 F.3d 452, 458 (4th Cir.2002); <u>Causey v. Balog</u>, 162 F.3d 795, 803 (4th Cir.1998); <u>Carter v. Ball</u>, 33 F.3d 450, 460 (4th Cir.1994). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action. <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that the adverse action was imposed because the plaintiff engaged in protected activity. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

A plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. <u>Warren v. Halstead Industries, Inc.</u>, 802 F.2d 746, *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2872, 101 L.Ed.2d 907 (1988) and <u>Mitchell v. Baldrige</u>, 759 F.2d 80 (D.C.Cir.1985).

The Fourth Circuit, in Von Gunten v. Maryland, 243 F.3d 858 (4th Cir.2001), addressed what an "adverse employment action" is for purposes of a Title VII retaliation claim. Although "ultimate employment actions" are adverse employment actions, a Title VII retaliation claim does not require an ultimate employment action. In Burlington Northern & Santa Fe R.R. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2410, 165 L.Ed.2d 345 (2006), the Supreme Court held that a plaintiff is not required to show "an adverse effect on the 'terms, conditions, or benefits' of employment" to support a retaliation claim (quoting Von Gunten, 243 F.3d at 866). It is sufficient if the plaintiff shows that a reasonable employee finds the employment action "materially adverse" or likely to "dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C.Cir.2006)).

In Garrett v. Lujan, 799 F.Supp. 198 (D.D.C.1992), the court observed that "[w]hile a causal nexus is inferred when the adverse employment action occurs shortly after participation in a protected activity," such inference is not appropriate when the time interval is too great. *Id.* at 202 (concluding that the passage of nearly a year precluded an inference of causal connection); *see* Parrott v. Cheney, 748 F.Supp. 312 (D.Md.1989) (even the passage of as little as five months between filing EEOC complaint and adverse action may be enough to negate causal connection in a particular factual context), *aff'd per curiam*, 914 F.2d 248 (4th Cir.1990). The Fourth Circuit recognized these concepts in Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir.1998):

> This Court has held that evidence that the alleged adverse action occurred shortly after the employer became aware of the protected activity is sufficient to "satisf[y] the less onerous burden of making a prima facie case of causa[tion]" Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989). We believe the opposite to be equally true. A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, as was the case here, negates any inference that a causal connection exists between the two. *See* Burrus v. United Tel. Co., 683 F.2d 339, 343 (10th Cir.1982) (holding that three years between

15

the protected activity and the adverse employment action was too long to establish the third element); Clark v. Chrysler Corp., 673 F.2d 921, 930 (7th Cir.1982) (holding that two-year time lapse negated any inference of causal connection). Indeed, were this not the case, an employee could guarantee his job security simply by filing a frivolous complaint with the EEOC on his first day of work. Title VII was not enacted to guarantee tenure in the workplace.

Generally, temporal evidence alone is insufficient to establish causation for completing a prima facie cause of retaliation, unless the "temporal proximity between an employer's knowledge of the protected activity and an adverse employment action" was "very close." Clark County School District v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

Cunningham alleges that her grievance challenging her three day suspension constituted a protected activity because in it she opposed race discrimination. (Complaint, ¶ 16). The grievance itself does not state that Cunningham believed the suspension was due to her race, but it does mention "retaliation and harassment." (Pl.Dep., Ex. 13). However, it appears that race was an issue in the grievance resolution process. In her letter to Human Resources dated July 10, 2008, she stated that the suspension was harassment and "racially motivated." (Def.Mem., Ex. C). In the third step of the grievance procedure the Director of Human Resources made a specific finding that the suspension did not involve "elements of harassment or discrimination." (Pl.Dep., Ex. 13). Therefore, in the light most favorable to Cunningham, the undersigned concludes that she raised the issue of racial discrimination through the filing of the grievance.

SMH argues that Cunningham cannot show causation because there is no evidence that her termination was due to the filing of the grievance and the length of time between the two events is too long in time to raise an inference of causation. Cunningham makes no argument with respect to causation. (Pl.Mem., pp. 9-10).

16

Cunningham's grievance is dated July 19, 2008 and it was finally resolved on August 20, 2008. Cunningham was terminated on February 18, 2009. Thus, six months passed between the time Cunningham prevailed on her grievance and the date she was terminated. This period is too long to establish causation by temporal proximity. *See* Pascual v. Lowe's Home Centers, Inc., 193 Fed.Appx. 229 (4th Cir. 2006) (per curium) (three to four months between protected activity and adverse action is insufficient to establish causation).

Cunningham could also establish causation by showing "other evidence of retaliatory animus" during the period between the protected activity and the adverse action. Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007). Cunningham has produced no such evidence. There is nothing in the record to indicate that Cunningham was disciplined between the time her grievance was resolved and she was terminated. Cunningham has not established a prima facie case of retaliation.[4]

### Conclusion

Based on a review of the record, it is recommended that Defendant's motion for summary judgment be **granted**.

_____
Joseph R. McCrorey
United States Magistrate Judge

Columbia, South Carolina

May 11, 2011

---

[4] Even if Cunningham could establish a prima facie case of retaliation, she has not shown the reasons given for her termination were pretextual. *See* above discussion.

17